# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KAREN PETERS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MOONLAKE IMMUNOTHERAPEUTICS, JORGE SANTOS DA SILVA, and MATTHIAS BODENSTEDT,<br><br>Defendants. | **CASE NO. 1:25-CV-08612-LAK**<br><br><u>**CLASS ACTION**</u><br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED**<br><br>April 16, 2026 |

Lead Plaintiff General Retirement System of the City of Detroit ("Plaintiff" or "Detroit Retirement"), by its attorneys, except for its own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by MoonLake Immunotherapeutics ("MoonLake" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, interviews with former Company employees and analyses by consultants. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired MoonLake common stock between March 10, 2024, and September 29, 2025, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934

(the "Exchange Act"). Plaintiff's claims are asserted against MoonLake and certain of the Company's executive officers and directors.

2.     This action arises from Defendants' misleading statements concerning the clinical profile, competitive positioning, and development prospects of MoonLake's lead drug candidate, sonelokimab ("SLK"). Defendants repeatedly assured investors that SLK demonstrated superior or leading clinical efficacy relative to competing therapies—including UCB's IL-17 inhibitor bimekizumab (marketed as Bimzelx)—and that the drug's development program had been substantially "de-risked" following positive Phase 2 results. These representations were highly material to investors because they suggested that SLK had already demonstrated clinical differentiation and was therefore positioned to become a leading therapy in a large and rapidly growing market for inflammatory disease treatments.

3.     Defendants' statements regarding SLK's purported superiority and differentiation were misleading because they lacked a reliable scientific basis. Rather than relying on direct comparative clinical evidence, Defendants repeatedly compared SLK's results to those reported for Bimzelx across separate clinical trials. Such cross-trial comparisons cannot reliably establish that one therapy is clinically superior to another because the underlying trials typically involve different patient populations, dosing regimens, study designs, endpoints, and placebo response rates. Despite these well-known limitations, throughout the Class Period, Defendants repeatedly highlighted apparent differences in response rates between the SLK and Bimzelx studies and presented those comparisons as evidence that SLK demonstrated superior clinical efficacy.

4.     For example, during MoonLake's March 10, 2024 R&D Day presentation, Chief Executive Officer Jorge Santos da Silva compared SLK's clinical results to those reported for Bimzelx and told investors that "no matter how many scores you look at, we are always

consistently above that drug," suggesting that SLK had already demonstrated superior clinical performance relative to its primary competitor. Defendants made similar statements in investor presentations and press releases throughout the Class Period, repeatedly asserting that SLK's responses were "numerically higher" than those observed with Bimzelx and emphasizing the drug's purportedly superior efficacy profile. By framing these comparisons as evidence of clinical superiority, Defendants conveyed to investors that SLK had already demonstrated meaningful differentiation from competing therapies.

5.     Defendants further reinforced this narrative by emphasizing SLK's molecular design and repeatedly suggesting that the drug's nanobody structure provided inherent advantages over traditional monoclonal antibodies such as Bimzelx. According to Defendants, SLK's smaller molecular size and ability to bind multiple IL-17 dimers would allow the drug to penetrate inflamed tissue more effectively and produce stronger clinical responses. These representations were intended to convince investors that SLK's molecular design translated directly into superior therapeutic outcomes and therefore justified the Company's claims that SLK could outperform existing treatments.

6.     At the same time, Defendants assured investors that SLK's development program was substantially "de-risked." Company executives repeatedly emphasized the strength of the Phase 2 clinical data and suggested that the probability of failure in Phase 3 trials was extremely low. For instance, during the March 10, 2024 R&D Day event, Defendant Reich stated that although one could never say the risk of failing to achieve statistical superiority to placebo was zero, the risk was "very, very, very, very low." Defendant Bodenstedt similarly told investors that there were "not a lot of assets like sonelokimab that are as de-risked as sonelokimab is," reinforcing the perception that the drug's clinical success was highly likely.

7.      These statements were materially misleading because Defendants lacked a legitimate scientific basis to claim that SLK had demonstrated superior efficacy relative to Bimzelx or that it was "de-risked." No head-to-head clinical trial comparing the two drugs had been conducted, and MoonLake itself acknowledged that such a study was "not available at the moment nor in the near future." Without direct comparative evidence, Defendants could not reliably determine whether SLK performed better than Bimzelx, yet they repeatedly framed cross-trial comparisons and modeling analyses as proof that SLK was the superior therapy.

8.      Moreover, Defendants' assertions that SLK was "de-risked" were materially false and misleading because they concealed that substantial clinical risk remained that SLK would fail to demonstrate consistent and clinically meaningful efficacy in Phase 3 trials. As Defendants knew or recklessly disregarded, Phase 2 data—derived from smaller and shorter studies, with more homogeneous patient populations—does not reliably predict Phase 3 outcomes, and the absence of direct comparative evidence further increased the uncertainty regarding SLK's true clinical profile.

9.      In reality, there remained a significant risk that SLK would fail to achieve statistically significant or commercially meaningful results in Phase 3—precisely the risk that later materialized when one of the VELA trials failed to meet its primary endpoint and the overall results fell short of Defendants' representations of superior efficacy. By characterizing SLK as "de-risked," Defendants misleadingly conveyed that the likelihood of such failure was minimal, when in fact it remained substantial.

10.     Moreover, the Company's Phase 3 VELA trials were designed to compare SLK to placebo rather than to Bimzelx or any other competing therapy. As a result, the Phase 3 program could not determine whether SLK was superior to Bimzelx, regardless of how the trials ultimately

performed. Despite this fundamental limitation, Defendants repeatedly suggested that the Phase 3 results would confirm SLK's leadership in the HS treatment market and further validate the Company's claims regarding the drug's superior clinical profile.

11.     The truth was revealed on September 28, 2025, when MoonLake announced the results of its Phase 3 VELA trials. The results failed to demonstrate the level of clinical performance Defendants had repeatedly suggested during the Class Period, undermining the Company's narrative that SLK demonstrated superior clinical efficacy, was highly differentiated from competing therapies, and was substantially "de-risked." Analyst Brian Abrahams of RBC Capital Markets described the results as "a near worst-case scenario" and Andy Chen of Wolfe Research proclaimed the outcome a "disastrous result."

12.     Investors likewise reacted swiftly. On September 29, 2025, MoonLake's stock price collapsed, declining $55.75 per share, or 89.9%, to close at $6.24 on September 29, 2025. This dramatic decline reflected the market's recognition that Defendants' prior claims regarding SLK's competitive superiority and de-risked development profile had been materially overstated.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and personal jurisdiction exists over each Defendant.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because the acts and transactions constituting the violations of the securities laws alleged herein occurred in substantial part within this District. In

addition, at all relevant times, MoonLake's common stock traded on the Nasdaq Global Market ("NASDAQ"), and continues to trade on the NASDAQ, an efficient national securities market located in the United States and accessible to investors in this District.

15.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail services, interstate telephone communications and the facilities of the national securities markets.

## **PARTIES**

16.    Plaintiff Detroit Retirement purchased MoonLake common stock during the Class Period as set forth in the certification previously filed as Dkt. 26-3, and has been damaged thereby.

17.    Defendant MoonLake is incorporated in the Cayman Islands with its principal place of business in Zug, Switzerland. The Company trades on the NASDAQ stock exchange under the ticker symbol "MLTX" and claims that it is "a clinical stage biotechnology company advancing therapies to address significant unmet needs in inflammatory skin and joint diseases."[1]

18.    Defendant Jorge Santos da Silva, Ph.D. ("da Silva") has served as Moonlake's Chief Executive Officer and as a member of its Board of Directors since April 2022. He co-founded MoonLake AG and served as its Chief Executive Officer from July 2021 until April 2022. Dr. Santos da Silva also serves as a professor and Board Advisor at the School of Medicine at the Minho University (Portugal). Prior to co-founding MoonLake AG, Dr. Santos da Silva was employed by McKinsey & Company, Inc., a consulting firm, from September 2007 to June 2021, where he served as Senior Partner and led the Pharmaceutical & Medical Products Practice, the

---

[1] *See* https://www.sec.gov/Archives/edgar/data/1821586/000114036124021749/ny20023928x3_ ars.pdf at 6 (last accessed April 15, 2026).

Biotech group and the Biosimilars group and advised international biopharmaceutical and biotechnology companies on corporate and business-unit strategy, commercial operating models, research and development, organizational design, mergers and acquisitions and joint ventures. Dr. Santos da Silva was a Postdoctoral Fellow at Cold Spring Harbor Laboratory and holds a Ph.D. in Neuronal Cell Biology from the University of Turin (Italy) and a B.Sc. in Molecular Biology from the University of Glasgow, Institute of Biological and Life Sciences (United Kingdom). He also participated in a work placement in neurobiology at the European Molecular Biology Laboratory, Heidelberg (Germany).[2]

19.    Defendant Matthias Bodenstedt ("Bodenstedt") has served as MoonLake's Chief Financial Officer since April 2022. He previously served as the Chief Financial Officer of MoonLake AG from July 2021 until April 2022. He has served as a director of MoonLake's subsidiary, MoonLake Immunotherapeutics Ltd. ("MoonLake Ltd."), since September 2021. Prior to joining the Company, from October 2011 to June 2021, Mr. Bodenstedt was a Partner at McKinsey & Company, Inc., a consulting firm, in Germany and Switzerland, where he advised a diverse set of clients, ranging from pre-revenue biotechnology companies to large global pharmaceutical companies. Mr. Bodenstedt has experience in financing, mergers and acquisitions, business development and licensing, portfolio strategy, and go-to-market strategy and execution. Mr. Bodenstedt holds an M.B.A. from Columbia Business School (New York), an M.Phil. in Finance from the University of Cambridge (United Kingdom), and B.Sc. in Industrial Engineering from the University of Hannover (Germany).[3]

---

[2] *See* https://www.sec.gov/Archives/edgar/data/1821586/000114036123020595/ny20007692x1_def14a.htm at 6-7 (last accessed April 15, 2026).

[3] *Id.* at 18.

20.    Defendant Kristian Reich ("Reich") has served as MoonLake's Chief Scientific Officer since April 2022.  He is a co-founder of MoonLake AG and served as its Chief Scientific Officer from May 2021 until April 2022. Dr. Reich has more than 25 years of experience as a global clinical leader in dermatology and immunology, with more than 300 peer-reviewed publications in mucosal and skin immunology. He received the Herbert-Herxheimer Research Prize from the German Society for Allergology and Clinical Immunology and the Stars of the Academy Award for achievements in psoriasis from the American Academy of Dermatology. Dr. Reich has served as a Guest-Professor for Translational Research in Inflammatory Skin Diseases at the University Medical Center Hamburg-Eppendorf, Germany, since April 2019. From 2005 to 2015, he served as managing partner at the Dermatologikum Hamburg, a private outpatient dermatology clinic, and he has served as a self-employed partner at the Dermatologikum Berlin, a private outpatient dermatology clinic, since 2013. Between 1996 and 2005, he held several clinical and teaching positions at the Department of Dermatology, Georg-August-University Goettingen, Germany, including most recently serving as University Professor and Vice Director of the Department of Dermatology. Dr. Reich is an independent medical director and founder of JeruCON Beratungsgesellschaft mbH Hamburg, where he is a self-employed consultant. Since 2016, Dr. Reich also serves as a medical advisor for TFS HealthScience, a contract research organization. Dr. Reich is also a member of the board of directors of Derma2go AG (Zürich, Switzerland), a privately held teledermatology company, Dermagnostix GmbH (Freiburg, Germany), a privately-held diagnostic medical device company and ProDerma Foundation (Hamburg, Germany), a charitable foundation focusing on dermatological research. Dr. Reich was accredited in Dermatology and Venerology in 2000 and in Allergology in 2003. He received his Dr. med. (M.D. equivalent) from the Technical University Munich (Germany) and his Venia

8

legendi (Ph.D. equivalent) in Dermatology and Venerology from the Georg-August-University (Germany).[4]

21.     Da Silva, Bodenstedt, and Reich are the Company's only Executive Officers[5] and collectively are referred to herein as the "Individual Defendants."

22.     MoonLake and the Individual Defendants are collectively referred to herein as "Defendants."

## CONTROL PERSON ALLEGATIONS

23.     By reason of the Individual Defendants' positions with the Company as executive officers, the Individual Defendants possessed the power and authority to control the contents of MoonLake's annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them, but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and/or misleading statements pleaded herein.

---

[4] *Id.*

[5] *Id.*; *see also* https://www.sec.gov/Archives/edgar/data/1821586/000114036124021744/ny200 23928x1_def14a.htm (last accessed April 15, 2026).

**CONFIDENTIAL WITNESS**

24.    Confidential Witness ("CW") was a Manager Medical Writer with MoonLake during approximately thirteen months of the Class Period. He[6] has a B.S. and two M.S. degrees in, inter alia, statistics, including biostatistics, and he subsequently trained as a medical writer.

25.    His department was responsible for preparing documentation for submission to regulatory authorities, including the FDA. During his tenure with MoonLake he was part of the Regulatory Affairs team and was primarily responsible for drafting regulatory documentation required for drug approval processes, including study protocols, investigative brochures, and related materials. He reported directly to the Head of Regulatory Affairs.

26.    In his position, he worked closely with the Clinical Development, Medical, and Medical Affairs teams which regularly provided input into submissions and protocols. The Medical team played a key role in ensuring scientific accuracy, informing the Regulatory Affairs team what they could or could not state.

27.    Throughout CW's tenure at MoonLake, da Silva, Bodenstedt and Reich were typically referred to as the "Executive Board" or "EB" internally. According to CW, the EB were very visible and present and attended all key study discussions, which he attended regularly. Every public statement that CW drafted on behalf of MoonLake had to be sent to and signed off on by the EB.

28.    From his work and communications with the Medical Affairs team, he understood that statements regarding SLK's potential advantages, including its nanobody structure and possible deeper tissue penetration, were hypotheses rather than established facts. Indeed, during CW's tenure with MoonLake, there was no evidence supporting a benefit because of the molecular size.

29.     During CW's tenure with the Company, SLK was tested in the Phase 3 trial against placebo rather than competitors' drugs. During that time, MoonLake neither conducted nor reviewed any direct comparisons between SLK and its competitor drugs, including Bimzelx. Therefore, during that time, any claims of SLK being superior to Bimzelx were speculative, as the science supporting why SLK may have been better was purely hypothetical.

## SUBSTANTIVE ALLEGATIONS

### I.     Background

30.     As disclosed by the Company shortly before the start of the Class Period, MoonLake was developing SLK to treat inflammatory diseases in dermatology and rheumatology including hidradenitis suppurativa ("HS"), psoriatic arthritis ("PsA"), axial spondyloarthritis ("axSpA") and psoriasis ("PsO").[7] The Company initiated a Phase 2b trial of SLK in patients with moderate to severe HS in May 2022 (the "MIRA trial") and in patients with active PsA in December 2022 (the "ARGO trial"), and also studied SLK in a Phase 2b trial of patients with PsO.[8] Each of the three Phase 2b trials were conducted with randomized active reference arms: in the MIRA and ARGO trials patients were treated with the drug commonly known as Humira; in the PsO trial, patients were treated with the drug commonly known as Cosentyx.[9]

31.     After announcing positive top-line results for the MIRA trial, on March 10, 2024, in a Form 8-K filed with the SEC, the Company announced that it would provide further details on the VELA trial design for the Phase 3 program of SLK to treat HS at its R&D Day to be hosted

---

[6] Please note, CW's noted sex is meant to be gender neutral.

[7] *See* https://www.sec.gov/Archives/edgar/data/1821586/000114036124021749/ny20023928x3_ars.pdf at 6 (last accessed April 15, 2026).

[8] *Id.*

[9] *Id.*

that same day.[10] Unlike that MIRA, ARGO and PsO Phase 2b trials with their active reference arms to existing drugs, the VELA Phase 3 trial compared SLK to placebo.[11] Indeed, as confirmed by CW, at no time during the Class Period were any studies conducted comparing SLK to Bimzelx.

32.     HS is a chronic inflammatory skin disease characterized by painful nodules, abscesses, and sinus tracts that can significantly impair patients' quality of life. The disease is believed to involve dysregulation of several inflammatory signaling pathways, including those mediated by cytokines in the interleukin-17 ("IL-17") family. Because HS has historically been difficult to treat effectively, pharmaceutical companies have increasingly focused on developing biologic therapies that target these inflammatory pathways.

33.     Among the therapies developed to treat inflammatory diseases are drugs designed to inhibit IL-17 signaling. IL-17 cytokines play an important role in immune responses and inflammatory processes, and drugs that inhibit these signaling pathways have demonstrated efficacy in certain inflammatory conditions. As a result, several pharmaceutical companies have developed therapies targeting IL-17 pathways for the treatment of diseases such as PsO, PsA, and HS.

34.     One such therapy is bimekizumab, marketed under the brand name Bimzelx, which was developed by UCB. Bimzelx is a monoclonal antibody designed to inhibit IL-17A and IL-17F signaling. The drug has demonstrated clinical efficacy in certain inflammatory diseases and has been approved in multiple jurisdictions for several indications.

---

[10]  https://www.sec.gov/Archives/edgar/data/1821586/000121390024021233/ea020149801ex99-1_moonlake.htm (last accessed April 15, 2026).

[11]  https://ir.moonlaketx.com/news-releases/news-release-details/moonlake-immunotherapeutics-starts-phase-3-vela-program (last accessed April 15, 2026).

35.    In fact, the FDA first approved Bimzelx for the treatment of adults with moderate to severe plaque PsO on Oct 18, 2023.[12] On Sep 23, 2024, the FDA approved Bimzelx for the treatment of PsO, non-radiographic axSpA and ankylosing spondylitis.[13] Then, on November 20, 2024, the FDA approved Bimzelx as the first IL-17A and IL-17F Inhibitor for adults with moderate to severe HS.[14]

36.    Because multiple companies were developing therapies targeting similar inflammatory pathways, the comparative clinical performance of competing drugs became an important consideration for physicians, regulators, and investors evaluating potential treatments. Drugs that demonstrated superior clinical efficacy or other meaningful advantages relative to existing therapies were generally expected to have stronger commercial prospects.

37.    During the relevant period, the development of new therapies targeting the IL-17 pathway was viewed as a potentially significant opportunity within the broader market for inflammatory disease treatments. As a result, clinical data suggesting that a new drug demonstrated superior efficacy relative to existing therapies could materially influence investor expectations regarding a company's future growth and commercial success.

## II.    MoonLake Promotes Sonelokimab as a Differentiated and De-Risked Therapy

38.    MoonLake is a clinical-stage biotechnology company focused on developing therapies for inflammatory diseases. During the Class Period, the Company's valuation depended largely on investor expectations regarding the clinical success and commercial potential of its lead drug candidate, SLK.

---

[12] *See* https://www.drugs.com/history/bimzelx.html (last accessed on April 15, 2026).

[13] *Id.*

[14] *Id.*

39.    SLK was designed to inhibit inflammatory signaling pathways involving IL-17 cytokines. According to the Company, the drug was engineered using a Nanobody structure, which differs from the traditional monoclonal antibodies used in many biologic therapies. Nanobodies are smaller antibody fragments derived from camelid antibodies and are designed to bind specific targets in the body.

40.    MoonLake repeatedly emphasized that SLK's nanobody design provided several potential advantages compared to conventional monoclonal antibodies. According to the Company, the molecule's smaller size could allow it to penetrate inflamed tissues more effectively, while its ability to bind multiple IL-17 dimers could enhance its ability to suppress inflammatory signaling. However, according to CW, statements regarding SLK's potential advantages, including its nanobody structure and possible deeper tissue penetration, were hypotheses rather than established facts. Indeed, during CW's tenure with MoonLake, there was no evidence supporting a benefit because of the molecular size.

41.    The Company also highlighted SLK's ability to bind IL-17A/A, IL-17A/F, and IL-17F/F dimers simultaneously. Defendants suggested that this binding profile distinguished SLK from competing therapies and could translate into improved clinical responses for patients suffering from inflammatory diseases.

42.    Because competing therapies—including Bimzelx—also targeted IL-17 signaling pathways, MoonLake frequently compared SLK's characteristics and clinical results with those of competing drugs in order to highlight what the Company described as SLK's differentiated profile.

43.    Prior to the start of the Class Period, MoonLake reported results from Phase 2 clinical trials evaluating SLK in inflammatory disease indications including HS. Following the release of these results, Defendants repeatedly emphasized what they described as the strength of

SLK's clinical profile and the drug's potential to achieve strong clinical responses across multiple disease areas.

44.     Defendants also repeatedly characterized SLK's development program as having been substantially "de-risked" following the Phase 2 results. That claim had significance, in part, because "de-risking potential drug targets or research projects to make them more attractive for commercial investment."[15]

45.     According to Defendants, the clinical data generated in the Company's earlier studies demonstrated that SLK had been positioned for successful advancement into late-stage clinical trials.

46.     Defendants' statements regarding de-risking formed a central component of MoonLake's investment narrative. Because the Company had no approved commercial products and relatively few clinical assets, investor expectations regarding the clinical performance of SLK played a significant role in determining the Company's market valuation.

47.     In order to further evaluate SLK's efficacy in patients with HS, MoonLake initiated the VELA Phase 3 clinical trial program. The VELA-1 and VELA-2 trials were designed to assess whether treatment with SLK produced statistically significant improvements in clinical outcomes compared to placebo in patients suffering from HS.

48.     The VELA trials were structured as placebo-controlled studies intended to measure clinical response rates and other indicators of disease improvement. The trials were not designed to include a direct head-to-head comparison between SLK and Bimzelx or other competing therapies targeting the IL-17 pathway.

---

[15] https://irp.nih.gov/about-us/our-programs/ncats (last accessed April 15, 2026).

49.    Nevertheless, throughout the Class Period, Defendants continued to emphasize what they described as SLK's differentiated clinical profile and repeatedly suggested that the drug had the potential to outperform competing therapies in the treatment of inflammatory diseases.

### III.    Established Scientific Limitations of Indirect Comparisons and Early-Stage Clinical Data

#### A.    Indirect and Cross-Trial Comparisons Cannot Reliably Establish Clinical Superiority

50.    In the field of clinical drug development, it is well understood that reliable conclusions regarding the comparative efficacy of competing therapies require direct evaluation within the same randomized, controlled clinical trial. Randomized controlled trials ("RCTs") are considered the gold standard for assessing treatment effects because they control for both known and unknown confounding factors and allow for valid comparisons between treatment arms.

51.    By contrast, so-called "cross-trial comparisons"—including comparisons of results from separate placebo-controlled studies—and network meta-analyses that rely on such comparisons are inherently limited and cannot reliably establish that one therapy is superior to another. These approaches attempt to infer relative efficacy across different clinical trials that were conducted under materially different conditions and therefore lack a common basis for comparison.

52.    Specifically, cross-trial comparisons are subject to significant sources of bias and confounding, including differences in patient populations, disease severity, prior treatments, geographic and demographic characteristics, study design, dosing regimens, endpoint definitions, and placebo response rates. Because these variables can materially influence observed outcomes,

16

any apparent differences in efficacy across separate trials may reflect these underlying differences rather than true differences between the therapies themselves.[16]

53.    For these reasons, indirect comparisons are generally regarded as exploratory or hypothesis-generating, rather than confirmatory evidence of comparative efficacy. Absent a head-to-head randomized trial comparing two therapies within the same study, it is not scientifically valid to conclude that one drug outperforms another.

54.    Because, at the time of the Class Period, none of the trials related to SLK included Bimezelx, any comparison of SLK to Bimzelx cannot be considered meaningful. Indeed:

> An externally controlled trial compares a group of subjects receiving the test treatment with a group of patients external to the study, rather than to an internal control group consisting of patients from the same population assigned to a different treatment. The external control can be a group of patients treated at an earlier time (historical control) or a group treated during the same time period but in another setting. The external control may be defined (a specific group of patients) or non-defined (a comparator group based on general medical knowledge of outcome). Use of this latter comparator is particularly treacherous (such trials are usually considered uncontrolled) because general impressions are so often inaccurate. So-called baseline-controlled studies, in which subjects' status on therapy is compared with status before therapy (e.g., blood pressure, tumor size), have no internal control and are thus uncontrolled or externally controlled[.][17]

## B.    Network Meta-Analyses Do Not Provide a Reliable Basis for Definitive Superiority Claims

55.    Network meta-analyses similarly rely on indirect comparisons by linking separate studies through a common comparator, typically placebo. While such analyses can be useful for

---

[16] *See, e.g.*, https://www.ejcancer.com/article/S0959-8049(09)00867-3/abstract (last accessed April 15, 2026). Lee, C. K., Lord, S. J., Stockler, M. R., Coates, A. S., Gebski, V., & Simes, R. J. (2010). Historical cross-trial comparisons for competing treatments in advanced breast cancer: An empirical analysis of bias. *European Journal of Cancer*, 46(3), 541–548 ("Caution should be exercised when interpreting results from historical cross-trial comparisons even if the adjustment of baseline prognostic characteristics can be performed.").

[17] *See* https://www.fda.gov/media/71349/download (last accessed on April 15, 2026). U.S. Food and Drug Administration. (2001). E10 Choice of Control Group and Related Issues in Clinical Trials: Guidance for Industry. International Council for Harmonisation.

generating hypotheses, they depend on strong assumptions—such as the similarity of patient populations, study designs, and outcome measures across trials—that often do not hold in practice.

56.     Because these assumptions cannot be directly tested and are frequently violated, network meta-analyses are subject to bias and uncertainty and do not provide a reliable scientific basis for concluding that one therapy is superior to another in the absence of direct comparative clinical evidence. As a result, regulatory authorities and clinical researchers do not treat such analyses as equivalent to head-to-head randomized clinical trials for purposes of establishing comparative efficacy.

**C.      Phase 2 Clinical Trials Are Exploratory and Do Not Establish Comparative Superiority or "De-Risk" Phase 3 Outcomes**

57.     It is also well established that Phase 2 clinical trials are exploratory in nature and are designed primarily to evaluate whether a drug shows preliminary evidence of efficacy and safety sufficient to justify further study. These trials typically involve relatively small patient populations and are not powered to establish definitive efficacy outcomes, much less comparative superiority over other therapies.

58.     Phase 2 results do not reliably predict Phase 3 outcomes. Differences in sample size, patient populations, study design, endpoints, and trial execution frequently lead to materially different results in later-stage trials. Indeed, a substantial proportion of drugs that demonstrate promising results in Phase 2 ultimately fail to confirm those results in Phase 3 clinical testing.

59.     Accordingly, while positive Phase 2 data may justify continued development, it does not eliminate meaningful clinical risk or render a drug's success in Phase 3 "de-risked."

**D.    Mechanistic or Molecular Differences Do Not Establish Superior Clinical Outcomes**

60.    Finally, differences in a drug's mechanism of action, molecular structure, or binding characteristics—such as differences between nanobody-based therapies and traditional monoclonal antibodies—do not, standing alone, establish superior clinical efficacy.

61.    While such characteristics may provide a theoretical or biological rationale for improved performance, they are hypothesis-generating and must be confirmed through clinical outcomes data obtained in well-controlled trials. Without such evidence, it is not scientifically appropriate to infer superior clinical performance based solely on mechanistic or preclinical differences.

**IV.    Defendants' Material Misrepresentations and Omissions**

**A.    March 10, 2024 R&D Day: Defendants Promote Sonelokimab as Clinically Superior and "De-Risked"**

62.    On Sunday, March 10, 2024, MoonLake hosted an investor-facing R&D Day presentation focusing on the: (i) ARGO trial, the Phase 2b trial related to the treatment of active PsA with SLK; (ii) VELA trials, the upcoming Phase 3 trial related to the treatment of HS with SLK; and (iii) new frontiers for SLK at Moonlake.

63.    During the R&D presentation the Company's senior executives promoted SLK as a highly differentiated therapy that had already demonstrated superior clinical efficacy relative to competing IL-17 inhibitors, including UCB's Bimzelx. Throughout the presentation, Defendants repeatedly emphasized SLK's purportedly superior response rates, unique molecular design, and favorable clinical profile, while assuring investors that the drug's development program had been substantially "de-risked" following the Company's Phase 2 results.

19

64.     During the presentation, Defendant da Silva emphasized what he claimed were fundamental molecular advantages of SLK relative to Bimzelx, suggesting that SLK's design enabled it to bind inflammatory targets more effectively and therefore produce superior clinical outcomes. Specifically, da Silva told investors:

> *What is different in our molecule, as I said, is that we are a Nanobody, so we have all those characteristics that a molecule bimekizumab does not have*. And when it comes to the affinity to bind these three dimers, the profile is very different. *We can bind all three dimers with very similar, very high affinity. That is very different from what bimekizumab can do.*

65.     Da Silva further reinforced the Company's narrative that SLK had already demonstrated superior clinical efficacy relative to Bimzelx by highlighting apparent differences in response rates observed across clinical studies and suggesting that SLK consistently outperformed its primary competitor. As part of the Company's "Recap: HS provides a sizable market with high unmet need", he told investors:

> *And when it comes to bimekizumab, our IL-17 A&F monoclonal competitor, I think you see that no matter how many scores you look at, we are always consistently above that drug*. So this is a very, very large market and I think we are well positioned to be the leaders.

66.     Defendant Bodenstedt stated:

> *We have seen the data from bimekizumab. We have seen our data now in multiple indications, where we would argue this is really the leading MoA,*[18] *and this is a differentiated MoA that has shown the highest efficacy outcomes across multiple indications, but not only the highest outcomes, but also durable outcomes.*

67.     Defendant Bodenstedt also directly contrasted SLK with Bimzelx and suggested that SLK's nanobody structure allowed it to penetrate inflamed tissues more effectively than traditional

---

[18] "In medicine, a term used to describe how a drug or other substance produces an effect in the body. For example, a drug's mechanism of action could be how it affects a specific target in a cell, such as an enzyme, or a cell function, such as cell growth. Knowing the mechanism of action of a drug may help provide information about the safety of the drug and how it affects the body. It may also help identify the right dose of a drug and which patients are most likely to respond to treatment. Also called MOA." *See* https://www.cancer.gov/publications/dictionaries/cancer-

monoclonal antibodies, further reinforcing the Company's claims that SLK possessed superior therapeutic properties:

> And then ultimately, I mean, there is only two assets that share the same way. ***There is bimekizumab, the traditional antibody, and then there is sonelokimab, the innovative nanobody that also binds to albumin, further helping the tissue penetration, getting the drug to the sites of inflammation***.

68.     Defendant Bodenstedt further emphasized what he described as unprecedented clinical outcomes associated with SLK, highlighting high treatment response thresholds and suggesting that SLK had achieved efficacy levels not previously observed in comparable studies:

> But even beyond this MoA, we do believe we have a differentiated molecule in the MoA. We have shown you the data, the efficacy data. Not only do we aim for higher outcomes, we use HiSCR75[19] as a primary endpoint. We look at IHS4-100[20] full clearance. ***We look at these very high, like ACR70,***[21] ***PASI100,***[22] ***that no one has ever shown before, and we get to outcomes that we have not seen in any other clinical studies before***.

69.     Reinforcing Defendants' narrative that SLK's development program had been largely "de-risked," Defendant Reich assured investors that the likelihood of SLK failing to demonstrate statistical superiority to placebo in the Phase 3 VELA trials was extremely low:

---

terms/def/mechanism-of-action (last accessed April 15, 2026)

[19] "HiSCR75" stands, in part, for Hidradenitis Suppurativa Clinical Response and is defined as a ≥75% reduction in total abscess and inflammatory nodule count with no increase in abscess or draining tunnel count relative to baseline. *See* https://www.sec.gov/Archives/edgar/data/1821586/000182158624000008/mnlk-20231231.htm at 8 (last accessed April 15, 2026).

[20] "IHSA-100" means an HS patient has 100% reduction in abscesses, nodules and draining tunnels. *See* https://ir.moonlaketx.com/news-releases/news-release-details/moonlake-immuno therapeutics-announces-full-dataset-its-24-week (last accessed April 15, 2026).

[21] "ACR70" represents at least a 70% improvement in tender and swollen joint counts and in three of the five criteria specified by the American College of Rheumatology. *See* https://www.ncbi.nlm.nih.gov/books/NBK549704/;

[22] "PASI100" is the treatment goal for patients with psoriasis – complete skin clearance. *See* https://pmc.ncbi.nlm.nih.gov/articles/PMC11480266/.

21

So if you ask me*, is there a real risk that we are not going to show statistical superiority to placebo in HiSCR75 in one of the studies, you should never say no, but the risk is very, very, very, very low*.

70.     Defendant Bodenstedt similarly emphasized that SLK was a rare asset whose clinical success was already largely assured, stating that there were "*not a lot of assets like sonelokimab that are as de-risked as sonelokimab is*."

71.     MoonLake's accompanying R&D Day presentation slides reinforced these representations by repeatedly asserting that SLK demonstrated superior clinical efficacy relative to competing IL-17 inhibitors, including Bimzelx. For example, the Company represented that "*SLK responses are numerically higher than observed with BKZ*,"[23] that "*SLK performs better than BKZ*, already at week 12," and that "*SLK performs better than others*, already at HiSCR50."

72.     The presentation further emphasized what Defendants described as SLK's superior performance across key clinical endpoints and high-response thresholds, asserting that SLK demonstrated "*elevated performance*" at high treatment goals such as HiSCR75, IHS4-100, and ACR50/70, and that the data reflected "*setting a new bar in HS for primary endpoints*."

73.     Defendants also repeatedly portrayed SLK as a leading or dominant therapy in the market for inflammatory diseases, stating that SLK was "*rapidly becoming a leader in large inflammatory diseases*," was "*positioned as [a] potential leader*," and that the HS results were "*staggering and confirm SLK as the potential leader*."

74.     In addition, the Company emphasized SLK's purported molecular and mechanistic advantages as a basis for its claimed clinical superiority, asserting that SLK was "*the only asset that binds all dimers and with similar affinity*," that it "*combines properties like no other asset*," and that it "*uses [the] best MoA and is highly differentiated (efficacy and likely safety)*."

---

[23] BKZ stands for Bimzelx.

75.    Finally, the presentation reinforced Defendants' claims that SLK's development program was substantially "de-risked," stating that "HS: Very positive FDA & EMA EoP2 meeting, *HS highly de-risked*."

76.    Collectively, these statements conveyed to investors that SLK had already demonstrated superior clinical performance relative to competing IL-17 inhibitors, including Bimzelx, and that its development program was highly likely to succeed and substantially "de-risked."

77.    The statements in paragraphs ¶¶64-75 above were materially false and misleading when made because Defendants misrepresented SLK's clinical profile, competitive positioning, and risk of clinical failure. Defendants represented that SLK had demonstrated superior efficacy relative to competing IL-17 inhibitors, including Bimzelx, and that its development program was substantially "de-risked." In reality, those statements lacked a reliable scientific basis and misstated the level of risk associated with SLK's Phase 3 development, which remained substantial. Specifically, Defendants failed to disclose that:

(i)    the network meta-analyses and cross-trial comparisons on which the Company based its claims that SLK demonstrated "leading efficacy" cannot reliably establish clinical superiority between SLK and competing therapies, including Bimzelx, because the underlying trials involve materially different patient populations, dosing regimens, study designs, endpoints, and placebo response rates;

(ii)    Defendants lacked direct clinical evidence demonstrating that SLK outperformed Bimzelx or other competing therapies;

(iii)    the Phase 3 VELA trials were designed to compare SLK only against placebo, and therefore could not determine whether SLK was superior to Bimzelx or other

23

competing therapies. Indeed, "[s]cientifically, efficacy is most convincingly established by demonstrating superiority to placebo in a placebo-controlled trial, by showing superiority to an active control treatment, or by demonstrating a dose-response relationship. This type of trial is referred to as a superiority trial";[24] and

(iv)    notwithstanding Defendants' claims that SLK was "de-risked," substantial risk remained that SLK would fail to achieve statistically significant or clinically meaningful results in Phase 3, including the risk that one or more trials would fail— precisely the risk that materialized when one of the VELA trials failed and the overall results fell short of Defendants' representations.

**B.    November 2024 – February 2025: Defendants Continue to Promote SLK as Differentiated and Potentially "Best-in-Class"**

78.    Following the March 10, 2024 R&D Day, Defendants continued to promote SLK as a highly differentiated therapy that purportedly demonstrated superior clinical efficacy relative to competing IL-17 inhibitors and possessed "best-in-class" potential. Throughout late 2024 and early 2025, Defendants continued to emphasize SLK's molecular characteristics and purportedly superior clinical response rates, while assuring investors that the drug's development program was highly likely to succeed.

79.    For example, on November 7, 2024, MoonLake issued a press release in which Defendant da Silva attributed SLK's purported clinical advantages to its molecular design and suggested that these features translated into superior patient outcomes and competitive differentiation. Specifically, da Silva stated:

---

[24] *See* https://pubmed.ncbi.nlm.nih.gov/25040429/ (last accessed April 15, 2026). U.S. Food and Drug Administration. (1998). *E9 statistical principles for clinical trials: Guidance for industry*. International Council for Harmonisation.

The strong clinical data that we continue to build on *suggests that the ability to inhibit all IL-17A and IL-17F containing dimers, together with the molecular advantages of our Nanobody®, translate into higher clinical responses for patients, and provide ample opportunity for differentiation of sonelokimab versus all competitors*. We look forward to 2025 with multiple data catalysts, including the expected primary readout of our Phase 3 VELA program in HS as of mid-year.

80.    The same press release further reinforced the Company's narrative that SLK possessed superior clinical potential and meaningful commercial differentiation, asserting that SLK had "*potentially best in class clinical data to date*."

81.    Shortly thereafter, on November 13, 2024, MoonLake again emphasized SLK's purported molecular advantages and suggested that its nanobody structure enabled improved therapeutic performance relative to competing therapies. The Company stated:

Sonelokimab, a Nanobody®, is designed to directly target sites of inflammation by inhibiting the IL-17A/A, IL-17A/F, and IL-17F/F dimers. *Its smaller size as a Nanobody® compared to antibodies allows it to better penetrate and treat difficult-to-reach inflamed tissues*.

82.    Defendants continued to promote SLK's purported superiority in the Company's February 26, 2025 Form 10-K, which represented that SLK had demonstrated leading clinical activity relative to other therapies. Specifically, the Company stated:

The results suggest that, as early as week 12, SLK, *relative to placebo, reaches the highest clinical activity among all other therapies tested in similarly stringent pivotal-like trials* (Figure 2).

83.    Through these statements, Defendants continued to convey to investors that SLK had already demonstrated superior clinical efficacy relative to competing IL-17 inhibitors and possessed "best-in-class" potential, reinforcing the Company's prior claims that SLK was highly differentiated and likely to succeed in late-stage clinical trials.

84.    The statements in paragraphs ¶¶79-82 above were materially false and misleading when made because Defendants misrepresented SLK's clinical profile, competitive positioning, and risk of clinical failure. Defendants represented that SLK had demonstrated superior efficacy

25

relative to competing IL-17 inhibitors, including Bimzelx, and that its development program was substantially "de-risked." In reality, those statements lacked a reliable scientific basis and misstated the level of risk associated with SLK's Phase 3 development, which remained substantial. Specifically, Defendants failed to disclose that:

(i)     the network meta-analyses and cross-trial comparisons on which the Company based its claims that SLK demonstrated "leading efficacy" cannot reliably establish clinical superiority between SLK and competing therapies, including Bimzelx, because the underlying trials involve materially different patient populations, dosing regimens, study designs, endpoints, and placebo response rates;

(ii)     Defendants lacked direct clinical evidence demonstrating that SLK outperformed Bimzelx or other competing therapies; and

(iii)     The Phase 3 VELA trials were designed to compare SLK only against placebo, and therefore could not determine whether SLK was superior to Bimzelx or other competing therapies.

### C.     April 29, 2025 Capital Markets Update: Defendants Continue to Claim Superior Efficacy Despite Lack of Comparative Evidence

85.     On April 29, 2025, MoonLake hosted a Capital Markets Update during which Defendants continued to promote SLK as demonstrating superior clinical efficacy relative to competing IL-17 inhibitors, including UCB's Bimzelx, and as a highly differentiated therapy with "leading" performance across key clinical endpoints.

86.     During the presentation, the Company emphasized what it described as SLK's superior clinical outcomes in HS, asserting that SLK had achieved the strongest results observed to date. Specifically, the Company stated that "***SLK achieved highest responses to date in HS***."

87.    The Company further represented that independent analyses supported SLK's purported clinical advantage over competing therapies, including Bimzelx, asserting that a "network meta-analysis" conducted by an independent analysis "*indicates SLK edge*" and that such analysis showed "similar picture" results in placebo comparisons, including an odds ratio of 4.6 for SLK versus 2.1 for BKZ.

88.    Defendants also continued to assert that SLK demonstrated superior efficacy and differentiation across clinical measures, stating that "*all evidence suggests leading efficacy* (label, data, network meta analysis), not the other way around – HiSCR75 is unique," and further representing that "*SLK uses best MoA and is highly differentiated (efficacy and likely safety)*."

89.    At the same time, however, the Company acknowledged that no direct clinical comparison between SLK and Bimzelx existed, stating that a "*[d]irect Comparison SLK vs. BKZ*" head-to-head study was "*not available at the moment nor in the near future*."

90.    Collectively, these statements conveyed to investors that SLK had demonstrated superior clinical efficacy relative to competing IL-17 inhibitors and possessed a clear clinical advantage supported by both trial data and independent analyses, despite the absence of direct comparative evidence and the Company's acknowledgment that no such head-to-head study existed or was planned.

91.    The statements in paragraphs ¶¶86-89 above were materially false and misleading when made because Defendants misrepresented SLK's clinical profile, competitive positioning, and risk of clinical failure. Defendants represented that SLK had demonstrated superior efficacy relative to competing IL-17 inhibitors, including Bimzelx, and that its development program was substantially "de-risked." In reality, those statements lacked a reliable scientific basis and

27

misstated the level of risk associated with SLK's Phase 3 development, which remained substantial. Specifically, Defendants failed to disclose that:

(i)     the network meta-analyses and cross-trial comparisons on which the Company based its claims that SLK demonstrated "leading efficacy" cannot reliably establish clinical superiority between SLK and competing therapies, including Bimzelx, because the underlying trials involve materially different patient populations, dosing regimens, study designs, endpoints, and placebo response rates;

(ii)     Defendants lacked direct clinical evidence demonstrating that SLK outperformed Bimzelx or other competing therapies; and

(iii)     the Phase 3 VELA trials were designed to compare SLK only against placebo, and therefore could not determine whether SLK was superior to Bimzelx or other competing therapies.

92.     Approximately two weeks later, two days after MoonLake filed its 10-Q for 1Q 2025 with the SEC, analyst Oppenheimer & Co., Inc. ("Oppenheimer") emphasized the importance that SLK was "de-risked" to the Company's success. Indeed, the subtitle of Oppenheimer's May 14, 2025 MoonLake Equity Research Quarterly Update was "1Q25: Ph3 VELA Meaningfully Derisked Ahead of September Readout". The Update considered VELA's de-risking a "Key Point" to Oppenheimer rating MoonLake as "Outperform" and emphasizing that "[w]e are buyers ahead of data in September. MLTX remains our top pick."

## V.    The Truth Emerges

93.     The truth regarding Defendants' misrepresentations and omissions was revealed to the market on Sunday, September 28, 2025, when MoonLake announced the week 16 results from its Phase 3 VELA clinical program evaluating SLK in patients with HS, consisting of two parallel trials, VELA-1 and VELA-2.

94.     Contrary to Defendants' repeated representations throughout the Class Period that SLK had already demonstrated superior clinical efficacy, was highly differentiated from competing therapies, and was substantially "de-risked," the Phase 3 results revealed a far more mixed and commercially insufficient clinical profile. While VELA-1 achieved statistical significance on its primary endpoint, VELA-2 failed to do so under the trial's primary analysis framework, undermining Defendants' claims that SLK consistently delivered superior clinical performance.

95.     Specifically, MoonLake disclosed that although VELA-1 met its primary endpoint with a statistically significant improvement over placebo, VELA-2 did not achieve statistical significance under the pre-specified composite strategy (HiSCR75, p=0.053), due in part to a higher-than-expected placebo response rate. Moreover, even where VELA-1 demonstrated statistical significance, the magnitude of benefit fell short of the level necessary to support Defendants' claims that SLK was competitive with, or superior to, existing IL-17 inhibitors such as Bimzelx. In particular, to be considered competitive as a leading therapy for HS, SLK was expected to exceed placebo by approximately 23 percentage points, a threshold that the VELA results did not consistently achieve. The failure of one of two identically designed Phase 3 trials, together with the insufficient magnitude and inconsistency of the observed treatment effects, called into question the robustness, reliability, and competitive significance of SLK's clinical profile.

96.     Notably, HiSCR has been established as "a valid and meaningful endpoint for assessing HS treatment effectiveness in controlling inflammatory manifestations[.]" *See* https://pubmed.ncbi.nlm.nih.gov/25040429/.[25]

---

[25] Kimball AB, Jemec GB, Yang M, Kageleiry A, Signorovitch JE, Okun MM, Gu Y, Wang K, Mulani P, Sundaram M. Assessing the validity, responsiveness and meaningfulness of the Hidradenitis Suppurativa Clinical Response (HiSCR) as the clinical endpoint for hidradenitis

97.     Although the Company emphasized alternative analyses and combined results in an effort to present the data more favorably, the disclosure made clear that SLK had not demonstrated the consistent, superior efficacy that Defendants had repeatedly represented during the Class Period. In particular, the inability of VELA-2 to achieve statistical significance under the primary analysis directly contradicted Defendants' assertions that the risk of failure in Phase 3 was "very, very, very, very low" and that SLK's development program was substantially "de-risked."

98.     The information revealed on September 28, 2025, corrected Defendants' prior misrepresentations and omissions by disclosing that SLK had not demonstrated the consistent, superior clinical efficacy Defendants had led investors to believe, and that the drug's development program was not, in fact, substantially "de-risked." Investors who had purchased MoonLake securities during the Class Period at artificially inflated prices suffered significant losses as the truth regarding SLK's clinical performance and competitive positioning became known.

99.     The market immediately recognized the significance of this information. Following the announcement, analysts sharply criticized both the results and the Company's prior positioning of SLK. For example, RBC Capital Markets analyst Brian Abrahams described the outcome as "a near worst-case scenario," while Wolfe Research analyst Andy Chen characterized the results as "disastrous."

100.     On September 28, 2025, Leerink Partners LLC Research ("Leerink") wrote, in part:

> **_We view these results as clearly disappointing – arguably falling into the worst case outcome from our preview note_** [ ], **_and we expect significant weakness in MLTX shares tomorrow._** We believe these results have introduced uncertainty around (1) SLK's path to approval in HS on basis of the two VELA trials, though we await more details on a potential path forward and FDA's receptivity to pooled results, treatment policy analyses, and MLTX's arguments around the totality of data from MIRA and VELA, (2) SLK's commercial outlook in HS now with a suboptimal profile vs. BKZ on HiSCR response and a host of clinical-stage

suppurativa treatment. Br J Dermatol. 2014 Dec;171(6):1434-42.

programs rapidly advancing in development, and (3) SLK's ongoing clinical programs in rheumatologic and dermatologic diseases, where the extent of negative readthrough from VELA to other SLK programs remains unclear. [Emphasis in original.]

101.    On September 29, 2025, the first trading day following the disclosure, MoonLake's stock price collapsed, declining $55.75 per share, or approximately 89.9%, to close at $6.24 per share. This extraordinary decline reflected the market's reassessment of SLK's clinical prospects, the reliability of its Phase 2 results, and the Company's prior claims regarding SLK's superiority and "best-in-class" potential.

102.    On that same day, Erela Dana, Director of Neurology and Immunology at GlobalData PLC, a London based data analytics and consulting company, stated that:

> The expectation was that sonelokimab would outperform Bimzelx, which showed HiSCR75 in ~60% of patients in Phase III studies. [ ] However, the 16-week data shows that not only has the benefit remained stagnant at ~35% mark after 12 weeks in the combined arm, in the VELA-2 trial, it decreased. This is combined with very high placebo rates. Durability of effect over 24+ weeks was defined as the primary driver of who could become the new blockbuster/leader in HS by KOLs, so the results are disappointing.[26]

103.    On September 29, 2025, analyst Wedbush Securities, Inc. ("Wedbush") issued a Quick Note subtitled "Disappointing HS Data May Have Eliminated Many Possibilities." Wedbush recognized "the Ph3 VELA data [w]as a big surprise to many if not all investors".

104.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of MoonLake's securities, Plaintiff and the other members of the Class have suffered substantial damages.

---

[26]    *See*    https://www.clinicaltrialsarena.com/news/moonlakes-il-17-inhibitor-falls-short-of-bimzelx-in-hs-trial/?cf-view&cf-closed (last visited April 15, 2026).

**ADDITIONAL SCIENTER ALLEGATIONS**

105.    As alleged herein, Defendants acted with scienter in that they knew, or at a minimum recklessly disregarded, that their public statements concerning SLK were materially false and misleading when made. Defendants were aware of, or had access to, information demonstrating that SLK had not been shown to be clinically superior to competing IL-17 inhibitors, including Bimzelx, and that the Company's data could not support the claims of "leading efficacy," "best-in-class" potential, or a substantially "de-risked" development program that Defendants repeatedly communicated to investors.

106.    Notably, the Individual Defendants are the Company's Executive Officers, and have extensive experience and expertise in the areas of dermatology, immunology, rheumatology, and pharmaceutical development. According to CW, the Individual Defendants (called the "Executive Board" or "EB" internally) were very visible and present and attended all key study discussions, which CW also attended regularly. Moreover, every public statement that CW drafted on behalf of MoonLake had to be sent to and signed off on by the Individual Defendants.

107.    Defendants' scienter is further supported by the fact that SLK was MoonLake's lead—and effectively only—drug candidate during the Class Period, and the Company had no approved commercial products. As a clinical-stage biotechnology company, MoonLake's valuation depended almost entirely on investor perceptions regarding SLK's clinical profile, competitive positioning, and likelihood of success in Phase 3 trials. Accordingly, Defendants—particularly the Company's Chief Executive Officer, Chief Financial Officer, and Chief Scientific Officer—were intimately involved in, and responsible for, evaluating and communicating SLK's clinical data, trial design, and development prospects. Given the central importance of SLK to the

32

Company's business, Defendants knew or recklessly disregarded the limitations of the data underlying their claims regarding SLK's purported superiority and "de-risked" profile.

108.   Defendants' knowledge or recklessness is further evidenced by their contemporaneous admission that no head-to-head clinical trial comparing SLK to Bimzelx had been conducted and was not planned, while simultaneously representing to investors that SLK had demonstrated superior clinical efficacy relative to that drug. As alleged herein, Defendants expressly acknowledged that a "[d]irect Comparison SLK vs. BKZ" was "not available at the moment nor in the near future." This was confirmed by CW who stated that during his tenure with the Company, SLK was tested against placebo rather than competitors' drugs. Indeed, during the the VELA trials, MoonLake neither conducted nor reviewed any direct comparisons between SLK and its competitor drugs, including Bimzelx.  Despite this admission, Defendants repeatedly asserted that SLK was "consistently above" Bimzelx, demonstrated "leading efficacy," and possessed a clinical "edge" over competing therapies. As a result, as confirmed by CW, any claims of SLK being superior to Bimzelx was speculative, as the science supporting why SLK may have been better than Bimzelx was purely hypothetical. This internal inconsistency between what Defendants knew and what they told investors supports a strong inference that Defendants acted with at least reckless disregard for the truth.

109.   Defendants also knew or recklessly disregarded that the Company's Phase 3 VELA trials were designed to compare SLK only against placebo and therefore could not establish clinical superiority over competing therapies, including Bimzelx. Notwithstanding this limitation, Defendants repeatedly suggested that the Phase 3 program would confirm SLK's leadership and superior clinical profile, reinforcing the misleading impression that SLK had already demonstrated, or would definitively demonstrate, superiority relative to existing treatments.

110.    Scienter is further supported by the timing and context of Defendants' statements. In April 2025, in anticipation of the readout of the Phase 3 VELA trials, MoonLake announced it had entered into an agreement to secure up to $500 million in non-dilutive financing from Hercules Capital, to be disseminated in five tranches. The Company emphasized that this financing strengthened its balance sheet, supported the continued advancement and anticipated commercialization of SLK, and "remove[d] any perceived financing overhang" as the Company approached its "pivotal data readout" for the VELA program. At the same time, Defendants continued to promote SLK as demonstrating superior clinical efficacy, "leading" performance, and significant competitive differentiation. While, due to the failure of one of two identically designed Phase 3 trials, together with the insufficient magnitude and inconsistency of the observed treatment effects, MoonLake did not satisfy the requirements of the second tranche, during the Class Period the Company received $75 million under the first tranche which was fully funded as of March 31, 2025.

111.    Analysts believed this financing was very important to the Company and its debt overhang and continued development of SLK for the treatment of HS. Leerink, in a Flash Note dated April 3, 2025, stated in part, that "Overall, we believe that access to the non-dilutive capital removes any perceived financing overhang as MLTX approaches the pivotal VELA data and potential launch of SLK." (Emphasis removed.) RBC Capital Markets, in an Equity Research Quick Take issued that same day, stated "While the company has publicly expressed in the past the potential for raising capital on positive HS data, we believe additional financing flexibility should help with funding overhangs as the company's opex increases into the potential HS launch."

112.    The proximity of these events supports a strong inference of scienter. Defendants had a compelling incentive to maintain and reinforce investor confidence in SLK's clinical

34

prospects and competitive positioning in order to secure favorable financing terms and sustain the Company's valuation ahead of the Phase 3 data readout. In this context, Defendants' continued assertions of superiority and "de-risking," despite their knowledge of the limitations of the underlying data and the absence of direct comparative evidence, further support the inference that Defendants acted knowingly or with reckless disregard for the truth.

113.    Finally, Defendants' scienter is underscored by the stark contrast between their repeated assurances during the Class Period that SLK's clinical success was highly likely and the actual Phase 3 results, which revealed that one of two identically designed trials failed to achieve statistical significance on the primary endpoint and that the overall results did not support Defendants' claims of consistent, superior clinical performance. The magnitude of this disconnect further supports a strong inference that Defendants' prior statements were not the product of mere optimism or corporate puffery, but were made with knowledge of, or reckless disregard for, their falsity.

## **LOSS CAUSATION**

114.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of MoonLake's common stock and operated as a fraud or deceit on Class Period purchasers of MoonLake common stock by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of MoonLake's common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of MoonLake common stock during the Class

Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

115.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's common stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiff and the other members of the Class purchased or acquired MoonLake common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

116.    At all relevant times, the market for MoonLake's common stock was an efficient market for the following reasons, among others:

(a)    MoonLake common stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)    MoonLake filed periodic public reports with the SEC and the NASDAQ;

(c)    MoonLake regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

36

(d)    MoonLake was followed by numerous securities analysts employed by major brokerage firms.

117.    As a result of the foregoing, the market for MoonLake common stock promptly digested current information regarding MoonLake from all publicly available sources and reflected such information in the prices of the common stock. Under these circumstances, all purchasers of MoonLake common stock during the Class Period suffered similar injury through their purchase of MoonLake common stock at artificially inflated prices and a presumption of reliance applies.

118.    Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its operations, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

## NO SAFE HARBOR

119.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading,

and/or the forward-looking statement was authorized or approved by an executive officer of MoonLake who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

120.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired MoonLake common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

121.   The members of the Class are so numerous that joinder of all members is impracticable, since MoonLake, as of February 1, 2025, had more than 63,282,727 shares of stock outstanding and because the Company's shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

122.   There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a)   whether the Exchange Act was violated by Defendants;

(b)   whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c)   whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e)     whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f)     whether the price of MoonLake common stock was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g)     whether the members of the Class have sustained damages as a result of the decline in value of MoonLake's stock when the truth was revealed, and if so, what is the appropriate measure of damages.

123.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

124.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

125.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) of
### the Exchange Act and SEC Rule 10b-5(a),
### (b), and (c) (Against All Defendants)

126.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

127.    This Count is asserted by Plaintiff on behalf of itself and the other members of the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a)-(c), 17 C.F.R. C 240.10b-5(a)-(c), promulgated thereunder.

128.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of MoonLake's common stock; and (iii) cause Plaintiff and the other members of the Class to purchase or otherwise acquire MoonLake's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

129. Defendants, by the use of means and instrumentalities of interstate commerce:(i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in an effort to maintain artificially high market prices for MoonLake's  common stock in violation of Section 10(b) of the Exchange Act and Rule 10-5.

130.    As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly

traded common stock would be based on truthful, complete, and accurate information. Defendants' material misrepresentations and omissions as set forth herein violated that duty.

131. Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class. Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

132. As a result of Defendants' fraudulent activity, the market price of MoonLake was artificially inflated during the Class Period.

133. In ignorance of the true financial condition of MoonLake, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of MoonLake containing the misleading information, purchased or otherwise acquired MoonLake's common stock at artificially inflated prices during the Class Period.

134. Plaintiff and the other members of the Class's losses were proximately caused by Defendants' active and primary participation in MoonLake's scheme, acts, practices, and course of business to defraud or operate as a fraud upon the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiff and other members of the Class purchased MoonLake's stock in reliance on the integrity of the market price of that common stock, and Defendants manipulated the price of MoonLake's common stock through their misconduct as described herein. Plaintiff's and the other members of the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of MoonLake.

135. Throughout the Class Period, Defendants were aware of material non-public information concerning MoonLake's fraudulent conduct (including the false and misleading

41

statements and omissions described herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the other members of the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

136.    As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of MoonLake common stock during the Class Period.

### COUNT II
### Violation of Section 20(a) of the Exchange
### Act (Against the Individual Defendants)

137.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

138.    During the Class Period, the Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had been mitigated and not disclosed to, and were being concealed from, the investing public. Plaintiff and other members of the Class had no access to such information, which was, and remains, solely under the control of the Defendants.

139.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct

those statements, in violation of federal securities laws. Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

140.   The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of MoonLake's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, the Individual Defendants are responsible for the accuracy of MoonLake's corporate releases detailed herein and are therefore responsible and liable for the misrepresentations and omissions contained herein.

141.   The Individual Defendants acted as controlling persons of MoonLake within the meaning of Section 20(a) of the Exchange Act. By reason of their positions with the Company, the Individual Defendants had the power and authority to cause MoonLake to engage in the wrongful conduct complained of herein. The Individual Defendants controlled MoonLake and all of its employees. As alleged above, MoonLake is a primary violator of Section 10(b) of the Exchange

43

Act and SEC Rule 10b-5. By reason of their conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

142.    As a direct and proximate result of the wrongful conduct of MoonLake and the Individual Defendants, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

(A)    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class and Abraham, Fruchter & Twersky, LLP as Class Counsel;

(B)    Awarding Plaintiff and the other members of the Class damages against all Defendants, jointly and severally, including interest thereon;

(C)    Awarding Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(D)    Awarding such other or further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.


Dated: April 16, 2026                    Respectfully submitted,


                                         s/ Patrice L. Bishop
                                         Patrice L. Bishop (Admitted *Pro Hac Vice*)
                                         **ABRAHAM, FRUCHTER & TWERSKY, LLP**
                                         Patrice L. Bishop (Admitted *Pro Hac Vice*)
                                         9440 Santa Monica Blvd.
                                         Bank of America Building
                                         Suite 301
                                         Beverly Hills, CA 90210
                                         Tel: (310) 279-5125
                                         pbishop@aftlaw.com

                                         – and –

                                         **ABRAHAM, FRUCHTER & TWERSKY, LLP**
                                         Mitchell M.Z. Twersky
                                         Lawrence D. Levit
                                         Atara Twersky
                                         450 Seventh Avenue, 38th Floor
                                         New York, New York 10123
                                         Tel: (212) 279-5050
                                         Fax: (212) 279-3655
                                         mtwersky@aftlaw.com
                                         llevit@aftlaw.com
                                         atwersky@aftlaw.com

                                         *Counsel for Lead Plaintiff General*
                                         *Retirement System of the City of Detroit*


45